AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
05/13/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___DM___ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

FILED
CLERK, U.S. DISTRICT COURT
5/13/2021
CENTRAL DISTRICT OF CALIFORNIA
BY: ___clee___ DEPUTY

United States of America

v.

SEAN PATRICK BOYLE,

Defendant(s)

Case No. 2:21-mj-02393

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 23, 2021 in the county of Santa Barbara in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1708 | Possession of Stolen Mail |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ John Piotrowski
Complainant's signature

USPIS Postal Inspector John Piotrowski
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 5/13/2021

Judge's signature

City and state: Los Angeles, California

Hon. Steve Kim, U.S. Magistrate Judge
Printed name and title

AUSA: Ashley Fillmore – 213-894-2416

**AFFIDAVIT**

I, John Piotrowski, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against SEAN PATRICK BOYLE ("BOYLE") for violation of Title 18, United States Code, Section 1708 (Possession of Stolen Mail).

2. This affidavit is also made in support of an application for a warrant to search 27 digital devices (the "SUBJECT DEVICES") in the custody of the United States Postal Inspection Service ("USPIS") in Los Angeles, California, as described more fully in Attachment A.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1708 (Mail Theft and Possession of Stolen Mail), 371 (Conspiracy), 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features, and Information), 1029 (Access Device Fraud), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. **BACKGROUND OF AFFIANT**

5. I am a Postal Inspector with the USPIS and have been since May 27, 2019. I am currently assigned to the Los Angeles Division, Alameda Domicile, Mail Theft Team. The USPIS investigates criminal activity surrounding the United States Postal Service as well as violations of Title 18 of the U.S. Code.

6. I hold a Bachelor of Science in Business Administration from Shippensburg University in Pennsylvania. I served seven years as an Armor Officer in the United States Army and was deployed to both Bosnia and Guantanamo Bay, Cuba. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program in Glynco, Georgia and the United States Secret Service Special Agent Training Course in Beltsville, Maryland. I served as a Secret Service Special Agent for 12 years prior to becoming a Postal Inspector.

7. During my tenure as a Postal Inspector, I have conducted and assisted in multiple criminal investigations. I have gained knowledge and experience in conducting investigations involving bank fraud, access device fraud, identity theft, and wire fraud. Through the course of conducting

these investigations, I have been involved in the use of the following investigative techniques: analyzing financial records, conducting physical surveillance, consensual monitoring and recording of non-telephonic surveillance communications, executing search and arrest warrants in the support of investigations, interviewing subjects and witnesses, and participating in undercover operations.

### III. SUMMARY OF PROBABLE CAUSE

8. On March 23, 2021, BOYLE was evicted from his apartment, located at 405 Corona Del Mar Drive, #1, Santa Barbara, CA, for failure to pay rent. The following day, the property owner entered the apartment to inspect it following BOYLE's eviction, and found that BOYLE had left behind various items, which she reported to the Santa Barbara Police Department ("SBPD"). On March 25, 2021, SBPD detectives executed a search warrant at the vacant apartment. There, detectives found over 200 hundred pieces of stolen mail, over 100 credit/debit cards bearing various names, over 35 identification cards ("IDs") bearing various names, and 148 individual checks belonging to approximately 89 different people. During an interview with SBPD detectives that same day, BOYLE admitted to receiving stolen mail and engaging in identity theft.

### IV. STATEMENT OF PROBABLE CAUSE

9. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. Law Enforcement Evicts BOYLE and Discovers Extensive Stolen Mail and Access Devices at His Residence

10. On March 25, 2021, I received a call from SBPD Detective Kyle Lowry, who investigates identity theft and property crimes in Santa Barbara. Detective Lowry conveyed to me the following:

    a. On March 23, 2021, Santa Barbara Sheriff's Department ("SBSD") deputies evicted BOYLE from the apartment where he had been residing, located at 405 Corona Del Mar Drive, Apartment 1, Santa Barbara, CA 93103, for failure to pay rent.

    b. On March 24, 2021, SBPD officers responded to a call from the property owner and the property manager for the apartment complex located at 405 Corona Del Mar Drive. They explained that when the property owner entered the apartment to inspect it after BOYLE was evicted, she noticed BOYLE had left behind mail and other items, including checks issued to various businesses and/or individuals other than BOYLE, numerous casino player club cards issued to individuals other than BOYLE, USB drives, and a blank credit card with a magnetic strip that had not yet been coded and embossed.

    c. On March 25, 2021, SBPD officers obtained an arrest warrant for BOYLE and a search warrant for his apartment at 405 Corona Del Mar Drive, Apartment 1, signed by the Honorable James E. Herman for the Superior Court of California, County of Santa Barbara, Case No. 21-12030. In executing the search warrant that same day, detectives found over 200 hundred pieces of stolen mail, over 100 credit and debit cards bearing

4

various names (23 of which were in BOYLE's name), over 35 IDs bearing various names (three of which are in BOYLE's name), binders of checks, which appeared ready to be cashed, and 148 individual checks with payees' and payors' names other than BOYLE's. Additionally, SBPD seized SUBJECT DEVICES, described in Attachment A, from the apartment.

### B. BOYLE Admits to Possessing Stolen Mail and Depositing Stolen Checks

11. On March 25, 2021, SBPD officers arrested BOYLE pursuant to the arrest warrant described above. I reviewed an audio recording of SBPD Detective Kyle Rapp's post-arrest interview of BOYLE on March 25, 2021. During the recorded interview, Detective Rapp asked BOYLE about several stolen checks from the City of Santa Barbara, which were the subject of a 2019 SBPD investigation. BOYLE stated that he was aware of the checks and that someone, whom he would not name, brought the checks to him because that person needed assistance "remote depositing" the checks. BOYLE admitted to depositing one of two stolen checks from the City of Santa Barbara into an ATM. He thought he was paid $100 for his efforts, although he did not specify by whom. The second check from the City of Santa Barbara was deposited remotely.

12. Detective Rapp conveyed to me that he obtained the transaction records for the remote deposit and subpoenaed the IP address connected to the remote deposit for the second City of Santa Barbara check deposited in 2019. The transaction records showed that this deposit came from BOYLE's IP address.

5

Additionally, one of the City of Santa Barbara checks was deposited into an account in the name of victim E.R.S.

13.   During the March 25, 2021 search of 405 Corona Del Mar Drive, # 1, law enforcement found documents bearing E.R.S.'s name. When investigators asked BOYLE about E.R.S., BOYLE responded that he does not know E.R.S. and that his friends brought him documents bearing her personal information.

14.   During the March 25, 2021 interview, BOYLE admitted to using other people's stolen personally identifying information ("PII") to apply for the credit cards that were found in his apartment. He said he tried to engage in credit card fraud as little as possible to reduce his exposure and he preferred to be a "teacher," meaning his friends would bring PII to BOYLE's apartment, and he would teach them how to fraudulently apply for credit cards. BOYLE also said that his friends bring him bags of mail, which he assumes has been stolen from mailboxes. He described mail theft as one of his friends' "favorite pastimes." BOYLE also said that sometimes his friends would bring him check books.

      **C.   Follow-up Investigation Confirms BOYLE Possessed Victims' Means of Identification without Authority**

15.   Following the search of BOYLE's former apartment, SBPD confirmed with at least three of the individuals whose names appeared on documents found in BOYLE's apartment that they do not know BOYLE and did not give him permission to possess their PII or use their identities.

16. Based on the volume of evidence seized from 405 Corona Del Mar Drive, # 1, the victim statements described above, and the statements BOYLE made during his interview, investigators suspect that various individuals would steal mail and then bring the stolen mail to BOYLE so that BOYLE could use the PII contained in the stolen mail to engage in identity theft, access device fraud, and bank fraud.

17. It is my belief that PII belonging to additional victims, as well as additional banking information and other evidence of the Subject Offenses, will be found on the SUBJECT DEVICES seized from 405 Corona Del Mar Drive, Apartment 1, Santa Barbara, CA 93103.

## V. TRAINING AND EXPERIENCE REGARDING FRAUD, MAIL AND IDENTITY THEFT CRIMES

18. Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

   a. People who steal mail are often involved in fraud and identity theft crimes. These individuals usually steal mail looking for checks, access devices, other PII (such as names, Social Security numbers, and dates of birth), and identification documents that they can use to fraudulently obtain money and items of value. Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

   b. It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud

crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft. Suspects often use digital devices to perpetrate their crimes due to the relative anonymity achieved by conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing PII for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

   c. Oftentimes mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

   d. It is also common for mail and identity thieves to keep "profiles" of victims on digital devices. Such "profiles" contain the PII of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

   e. It is common for mail thieves, identity thieves, and individuals engaged in bank fraud, access device fraud, and

8

identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers.

   f. Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business. Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

   g. Individuals engaged in mail and identity theft often use multiple digital devices.

### VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

 19. As used herein, the term "digital device" includes the SUBJECT DEVICES.

 20. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.  The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    21.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.    Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

22. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c. The person who was in possession of a device or had the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BOYLE's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of BOYLE's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

23. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

24. For all of the reasons described above, there is probable cause to believe that BOYLE has committed a violation of Title 18, United States Code, Section 1708 (Possession of Stolen Mail).

25. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

/s/
John Piotrowski
Postal Inspector
U.S. Postal Inspection Service

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this <u>13th</u> day of <u>May</u>, 2021.

HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE

13